**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 17-22532-CIV-MARTINEZ/AOR**

CHARLES PAIGE,

     *Pro Se* Plaintiff,

v.

THE HACKETT GROUP, INC.,

     Defendant.

_____ /

## REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court upon Defendant The Hackett Group, Inc.'s ("Defendant" or "THG") Motion for Summary Judgment [D.E. 76]. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636 by the Honorable Jose E. Martinez, United States District Judge [D.E. 34]. For the reasons stated below, the undersigned respectfully recommends that Defendant's Motion for Summary Judgment be GRANTED.

## PROCEDURAL AND FACTUAL BACKGROUND

On July 7, 2017, *Pro Se* Plaintiff Charles Paige ("Plaintiff") filed a claim for employment discrimination based on race and color pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-15. See Complaint and Demand for Jury Trial (hereafter, "Complaint") [D.E. 1]. On August 17, 2017, Defendant filed a Motion to Dismiss Plaintiff's Complaint arguing, *inter alia*, that Plaintiff's Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") was untimely. See Motion to Dismiss [D.E. 10]; Plaintiff's EEOC Charge No. 510-2013-00907, dated August 5, 2013 (hereafter, "EEOC

Charge") [D.E. 10-1].  On March 21, 2018, the Court granted Defendant's Motion to Dismiss without prejudice.  See Order Granting Motion to Dismiss [D.E. 31].

On April 10, 2018, Plaintiff filed an Amended Complaint asserting a claim for employment discrimination based on race, pursuant to Title VII [D.E. 32].  The Amended Complaint alleges:

> ➤ Plaintiff, who is African American, began working for Defendant as an Enterprise Performance Manager on or around May 9, 2011.  He worked in this capacity until he was terminated on March 23, 2012.

> ➤ He performed the duties of his position in a satisfactory manner.

> ➤ Defendant hired a Caucasian employee to work in the same or similar position as Plaintiff.

> ➤ Defendant terminated Plaintiff because of his race and replaced him with the Caucasian employee.

> ➤ Defendant provided pretextual reasons for his termination.

See Amended Complaint [D.E. 32 ¶¶ 15-18].  Plaintiff attached to his Amended Complaint a letter from the EEOC dated March 30, 2018 (hereafter, "EEOC Letter") and a copy of an EEOC Intake Questionnaire completed by Plaintiff dated November 27, 2012 (hereafter, "Intake Questionnaire") [D.E. 32 at 7-12].  The EEOC Letter referenced EEOC Charge No. 510-2013-00907 and stated that the EEOC had received the Intake Questionnaire on December 4, 2012.  See EEOC Letter [D.E. 32 at 7].  The EEOC Letter further stated that the "EEOC's Miami District Office properly began processing the enclosed EEOC Intake Questionnaire as a Charge of Discrimination upon the date of receipt.  December 4, 2012." Id.

On April 23, 2018, Defendant filed a Motion to Dismiss Plaintiff's Amended Complaint (hereafter, "Second Motion to Dismiss") [D.E. 33], arguing again that Plaintiff's EEOC Charge was untimely filed.  See Second Motion to Dismiss [D.E. 33].  On March 5, 2019, the Court denied

the Second Motion to Dismiss finding that a ruling on that Motion would be "premature . . . and [the timeliness issue] would be more appropriately resolved at a later stage in the proceedings." See Order Rejecting Report and Recommendation [D.E. 42 at 4-5].

On November 25, 2019, Defendant filed its Motion for Summary Judgment arguing that it is entitled to judgment as a matter of law because: (1) Plaintiff failed to satisfy the administrative prerequisites to maintain a claim under Title VII; and (2) the undisputed material facts make clear that Plaintiff never fell victim to race discrimination.  See Motion for Summary Judgment [D.E. 76 at 5-18].  Defendant contemporaneously filed its Statement of Undisputed Material Facts (hereafter, "Statement of Undisputed Facts") [D.E. 77].  Defendant also filed the following supporting documents:  Mark T. Wirth's Affidavit (hereafter, "Wirth Affidavit") [D.E. 77-1]; Michelle D. Ramirez's Affidavit (hereafter, "Ramirez Affidavit") [D.E. 77-2]; John LoPresti's Affidavit (hereafter, "LoPresti Affidavit) [D.E. 77-4] (collectively, "Affidavits"); and Plaintiff's deposition transcript [D.E. 77-3].[1]

On January 2, 2020, Plaintiff filed his Response to Movant Summary Judgment (hereafter, "Response") [D.E. 86], wherein he responded to Defendant's Statement of Undisputed Facts but failed to address the substantive arguments made in Defendant's Motion for Summary Judgment. See Response [D.E. 86].[2]

---

[1] Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure requires that the party moving for summary judgment support its assertion that a fact cannot be genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A).

[2] Plaintiff also filed separate responses to each of the Affidavits indicating his position as to whether the averments therein were disputed or undisputed.  See Response to Ramirez Affidavit [D.E. 87]; Response to LoPresti Affidavit [D.E. 88]; and Response to Wirth Affidavit [D.E. 89] (collectively, "Responses to Affidavits").  Because Plaintiff's Response [D.E. 86] also challenges the facts asserted in Plaintiff's Statement of Undisputed Facts, whose source are the Affidavits, the undersigned finds his Responses to Affidavits to be duplicative.  See Joseph v. Napolitano, 839 F. Supp. 2d 1324, 1329 (S.D. Fla. 2012) (Southern District of Florida Local Rule 56.1's "clear procedural directive is intended to reduce confusion and prevent the Court from having to scour the record and perform time-intensive fact searching.").

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure (hereafter "Rule 56(a)")

"[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "A fact

is material if it 'might affect the outcome of the suit under the governing law.'"  Fonseca v. Wal-

Mart Stores, E., LP, No. 18-CV-62768, 2019 WL 7371813, at *2 (S.D. Fla. 2019) (quoting

Anderson, 477 U.S. at 248).

The movant must support its assertion that there is no genuine dispute as to any material

fact by "citing to particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R.

Civ. P. 56(c)(1)(A).  When determining whether a genuine issue of material fact exists, courts

"view all evidence and draw all reasonable inferences in favor of the nonmoving party."  Smith v.

Royal Caribbean Cruises, Ltd., 620 F. App'x 727, 729 (11th Cir. 2015).

"After the movant has met its burden under Rule 56(a), the burden of production shifts and

the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to

the material facts.'"  Corbin v. Town of Palm Beach, No. 13-CV-80106, 2014 WL 866415, at *2

(S.D. Fla. 2014) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986)).  When asserting that a material fact is genuinely disputed, the nonmoving party must

support its assertion by either: (A) "citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations

(including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or (B) "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1)(A), (B). "If the evidence advanced by the nonmoving party 'is merely colorable, or is not significantly probative, then summary judgment may be granted.'" Corbin, 2014 WL 866415, at *2 (quoting Anderson, 477 U.S. at 249-50). Additionally, "a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment." Sainz v. Cabarceno Enterprises, Inc., No. 14-CV-20608, 2015 WL 12551061, at *1 (S.D. Fla. 2015) (citing Anderson, 477 U.S. at 252).

## TIMELINESS OF PLAINTIFF'S CHARGE OF DISCRIMINATION

Defendant argues that Plaintiff's Title VII claim is barred because: (a) his EEOC Charge was untimely filed; and (b) his timely filed Intake Questionnaire was not tantamount to a charge. See Motion for Summary Judgment [D.E. 76 at 15-18].

a. *Timeliness of Plaintiff's EEOC Charge*

Prior to filing a complaint under Title VII, a plaintiff must first administratively exhaust his or her claims by filing a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e); E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1271 (11th Cir. 2002) ("For a charge to be timely in a deferral state such as Florida, it must be filed within 300 days of the last discriminatory act.") (citing 42 U.S.C. § 2000e–5(e)(1)). "Accordingly, only those claims arising within 300 days prior to the filing of the EEOC's discrimination charge are actionable." Joe's Stone Crabs, Inc., 296 F.3d at 1271 (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)). "The plaintiff has the burden of establishing that he filed a timely charge of discrimination." Shi v. Montgomery, 679 F. App'x

5

828, 831 (11th Cir. 2017) (citing <u>Jackson v. Seaboard Coast Line R. Co.</u>, 678 F.2d 992, 1004-10 (11th Cir. 1982)).

Plaintiff was terminated by Defendant on March 23, 2012 and did not file his EEOC Charge until August 2013, which is beyond the prescribed 300-day period.  <u>See</u> EEOC Charge [D.E. 10-1 at 2-3]; <u>Joe's Stone Crabs, Inc.</u>, 296 F.3d at 1271.  Accordingly, Plaintiff's claim is barred unless his Intake Questionnaire, which was filed within the 300-day statute of limitations period, is deemed tantamount to a charge.  <u>See</u> <u>Pettiford v. Diversified Enterprises of S. Georgia, Inc.</u>, No. 18-CV-105, 2019 WL 653813, at *3 (M.D. Ga. 2019) (stating that, because the plaintiff's charge of discrimination was untimely, "[t]he only means for [p]laintiff's Title VII claim to be deemed timely is if the intake questionnaire. . . satisfies the requirements for a charge of discrimination").

  b. <u>*Intake questionnaire as tantamount to a charge*</u>

"[A]bsent exceptional circumstances, an intake questionnaire will not be deemed tantamount to a charge."  <u>Byrd v. UPS</u>, No. 19-13758, 2020 WL 2849941, at *1 (11th Cir. 2020). For an intake questionnaire to be deemed tantamount to a charge, it must: "(1) be written, (2) be verified [by the time the employer is required to respond to the charge],[3] (3) include the information required by 29 C.F.R. § 1601.12(a),[4] and (4) 'convince a reasonable person that the

---

[3] "[A]n unverified filing which is filed within the statutory time limit, and otherwise meets the requirements of a charge, can, in fact, be considered a charge . . . if it is supplemented by a subsequent verification that is filed before the employer is required to respond to the charge."  <u>Fatz v. Winn-Dixie Stores</u>, Inc., No. 12-CV-1668, 2013 WL 4080330, at *5 (M.D. Fla. 2013) (citing <u>Wilson v. Sprint/United Mgmt. Co.</u>, No. 10-CV-1663, 2011 WL 2670184, at *5 (M.D. Fla. 2011)); <u>see also</u>  29 C.F.R § 1601.12(b) ("A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments . . . related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received.").

[4] Pursuant to Title 29, Code of Federal Regulations, Section 1601.12(a)(1)-(5), a charge of discrimination should contain the following information:

**(1)** The full name, address and telephone number of the person making the charge except as provided in § 1601.7;
**(2)** The full name and address of the person against whom the charge is made, if known (hereinafter referred to as the respondent);

charging party manifested [his] intent to activate the administrative process by filing the intake questionnaire with the EEOC.'"  Prince v. Dep't of Corr., No. 15-CV 1855, 2017 WL 10023750, at *4 (M.D. Fla. 2017) (citing Chesnut v. Ethan Allen Retail, Inc., 971 F. Supp. 2d 1223, 1229 (N.D. Ga. 2013)); see also Fatz, 2013 WL 4080330, at *5 (citing Edelman v. Lynchburg Coll., 535 U.S. 106, 112–13 (2002)).

Defendant does not dispute that the Intake Questionnaire was written, was verified by the time Defendant was required to respond to the EEOC Charge, and included the information required by C.F.R. Section 1601.12(a).  See Motion for Summary Judgment [D.E. 76 at 15-16]. Nevertheless, Defendant argues that the Intake Questionnaire is not tantamount to a charge because a reasonable person would not believe that Plaintiff manifested an intent to activate the administrative process by filing the Intake Questionnaire with the EEOC.  Id. at 16-18.

To make this assessment,  "the filing must be examined from the standpoint of an objective observer to determine whether, by a reasonable construction of its terms, the filer requests the agency to activate its machinery and remedial processes[.]"  Fed. Exp. Corp. v. Holowecki, 552 U.S. 389, 402 (2008).  The Intake Questionnaire contains the following instructions:

> Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire. . . . If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1. If you want to file a charge, you should check Box 2.

---

(**3**) A clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices: See § 1601.15(b);
(**4**) If known, the approximate number of employees of the respondent employer or the approximate number of members of the respondent labor organization, as the case may be; and
(**5**) A statement disclosing whether proceedings involving the alleged unlawful employment practice have been commenced before a State or local agency charged with the enforcement of fair employment practice laws and, if so, the date of such commencement and the name of the agency.

29 C.F.R § 1601.12(a)(1)-(5) (hereafter, "C.F.R. Section 1601.12(a)").

Intake Questionnaire [D.E. 32 at 12]. Plaintiff selected Box 2, which reads as follows:

> *I want to file a charge of discrimination*, and I authorize the EEOC to look into the discrimination I described above. I understand that the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name. I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

Id. (emphasis added). The Intake Questionnaire also states:

> PRINCIPAL PURPOSE. The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide filing counseling as appropriate. Consistent with 29 C.F.R. 1601.12(b) and 29 CFR 1626.8(c), *this questionnaire may serve as a charge if it meets the elements of a charge*.

Id. (emphasis added). Viewing all the evidence and drawing all reasonable inferences in Plaintiff's favor, the undersigned concludes that, based on the language of the Intake Questionnaire, Plaintiff's selection of Box 2, and Plaintiff's inclusion of the information set forth in C.F.R. Section 1601.12(a), a reasonable person would believe that Plaintiff manifested an intent to activate the administrative process by filing the Intake Questionnaire with the EEOC. See, e.g., Woodward v. Jim Hudson Luxury Cars, Inc., No. 18-CV-032, 2019 WL 4793058, at *6 (S.D. Ga. 2019) (finding that the plaintiff manifested her intent to activate the administrative process when: the plaintiff selected Box 2 of the intake questionnaire; and the intake questionnaire also contained the following language, "Consistent with 29 C[.]F[.]R[.] [§] 1601.12(b) . . ., this questionnaire may serve as a charge if it meets the elements of a charge.") (alterations in original); Robinson v. Alabama State Univ., No. 16-CV-148, 2019 WL 6880826, at *4–5 (M.D. Ala. 2019) (finding that the plaintiff, whose intake questionnaire contained the same instructions cited above and who also selected Box 2, "reasonably could have believed that, by submitting the questionnaire, she was doing all she was required to do to satisfy EEOC filing requirements."); Fatz, 2013 WL 4080330,

8

at *5 (stating that a reasonable person "could clearly view" selection of Box 2 of the intake questionnaire "as an attempt to activate the administrative process.").

Based on the foregoing analysis, the undersigned concludes that the timely filed Intake Questionnaire is tantamount to a charge; hence, Plaintiff administratively exhausted his claim by filing a charge of discrimination with the EEOC within 300 days of the alleged unlawful employment practice. Joe's Stone Crabs, Inc., 296 F.3d at 1271; Fatz 2013 WL 4080330, at *5. Accordingly, Defendant is not entitled to summary judgment on this basis.

## THE TITLE VII CLAIM

### 1. Applicable Law

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2. A plaintiff may establish a *prima facie* case of race discrimination under Title VII by relying on either direct or circumstantial evidence. Tomczyk v. Jocks & Jills Restaurants, LLC., 198 F. App'x 804, 809 (11th Cir. 2006) (citing E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000)). "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (citing Carter v. City of Miami, 870 F.2d 578, 581-82 (11th Cir. 1989)). Reliance on circumstantial evidence, requires the plaintiff to show that: "(1) [he] is a member of a protected class; (2) [he] was subjected to an adverse employment action; (3) [his] employer treated similarly situated employees outside of [his] protected class more favorably than [he] was treated; and (4) [he] was qualified to do the job. Tomczyk, 198 F. App'x at 809 (citing Joe's Stone Crab, Inc., 220 F.3d at 1286).

If the plaintiff succeeds in establishing a *prima facie* case of race discrimination under Title VII, "a [rebuttable] presumption of discrimination is created."   Adams v. Cobb Cty. Sch. Dist., 242 F. App'x 616, 619 (11th Cir. 2007) (citing Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1309 (11th Cir. 2007)).   The presumption may be rebutted by "articulating a legitimate, non-discriminatory reason for the adverse action." Kocsis v. Fla. State Univ. Bd. of Trustees, 788 F. App'x 680, 686–87 (11th Cir. 2019) (citing Bryant v. Jones, 575 F.3d 1281, 1308 (11th Cir. 2009)). "If the defendant carries this burden, the plaintiff must demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions." Kocsis, 788 F. App'x at 687 (citing Bryant, 575 F.3d at 1308). "If the plaintiff does that, [he] can avoid judgment as a matter of law against [him]." Tomczyk, 198 F. App'x at 810 (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997)).

A plaintiff can also overcome summary judgment in a Title VII action if he or she presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." Lewis v. City of Union City, Georgia, 934 F.3d 1169, 1185 (11th Cir. 2019) (quotations omitted) (quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)). "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." Lewis, 934 F.3d at 1185 (alteration omitted) (quoting Silverman v. Bd. of Educ. of City of Chicago, 637 F.3d 729, 734 (7th Cir. 2011).

## 2. **Undisputed Facts**

As noted above, Defendant filed its Statement of Undisputed Facts, which properly cited to supporting record evidence [D.E. 77].  Plaintiff disputes ¶¶ 1-3, 6, and 8-31 of Defendant's Statement of Undisputed Facts.  See Response [D.E. 86 at 2-11].  However, Plaintiff's purported disputes of fact fail for the following reasons:

> ➢ Plaintiff failed to comply with Rules 56(c)(1)(A) or (B) of the Federal Rules of Civil Procedure (cited above) or Local Rules 56.1(a)(2) or (c) of the Southern District of Florida's Local Rules with respect to ¶¶ 1-3, 6, 8-13, and 15-31.[5]  Specifically, Plaintiffs contentions that the material facts asserted in those paragraphs are genuinely disputed either did not: cite to particular parts of materials in the record; show that the materials cited by Defendant do not establish the absence of a genuine dispute; clearly challenge the material fact asserted by Defendant; or controvert the material fact asserted by Defendant. See Fed. R. Civ. P. 56(c)(1)(A), (B); S. D. Fla. L. R. 56.1(a)(2), (c).

> ➢ Plaintiff's purported factual dispute as to ¶ 14 relies on unverified assertions made in his Amended Complaint, which "are not evidence for purposes of a motion for summary judgment." Harvest Sensations, LLC v. Worldwide Produce & Groceries, Inc., No. 11-CV-22077, 2013 WL 12380651, at *1 (S.D. Fla. 2013) (citing Holloman v. Jacksonville Hous. Auth., No. 06-10108, 2007 WL 245555, at *4 (11th Cir. 2007)).

See Response [D.E. 86 at 2-11].

Given Plaintiff's failure to controvert Defendant's Statement of Undisputed Facts, the undersigned deems them admitted.  See Fed. R. Civ. P. 56(e) ("If a party fails to properly . . . address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . ."); S. D. Fla. L. R. 56.1(c).  Therefore, the following facts (hereafter, "Undisputed Facts") are taken verbatim from Defendant's Statement of Undisputed Facts:

---

[5] Local Rule 56.1(a)(2) of the Southern District of Florida's Local Rules requires that the nonmovant's Statement of Material Facts "clearly challenge any purportedly material fact asserted by the movant that the [nonmovant] contends is genuinely in dispute."  S. D. Fla. L. R. 56.1(a)(2).  Local Rule 56.1(c) of the Southern District of Florida's Local Rules states that: "All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under Fed. R. Civ. P. 56 does not apply."  S. D. Fla. L. R. 56.1(c).

1.   THG is a global, strategic business advisory and operations improvement consulting firm that provides practice advisory, business benchmarking, and transformation consulting services, including with regard to strategy and consulting operations, working capital management, and globalization advice.  THG provides its services across a number of industries, including pharmaceutical, manufacturing, and financial services.

2.   THG is an equal opportunity employer and maintains comprehensive anti-discrimination and anti-harassment policies, as well as a detailed reporting procedure, each of which is found in THG's Code of Conduct.  THG provides the Code of Conduct to all THG associates during the onboarding process, and each associate must acknowledge receiving a copy by completing an online form.

3.   Mr. Paige began his employment with THG on or about May 9, 2011, as an Enterprise Performance "Manager" in the Infrastructure Technologies practice group.

4.   Mark Wirth, former Principal and Global Practice Lead, Infrastructure Technologies, was responsible for hiring Mr. Paige.

5.   At the time of Mr. Paige's hire, the Infrastructure Technologies group was composed of three teams: EPM/BI Architecture and Deployment, Performance Management, and Managed Services.  The most senior person on each team held the title "Principal," the next most senior title was "Associate Principal," and thereafter, in order of descending hierarchy, the associates on each team fell into the following categories: Senior Director, Director, Senior Manager, and, finally, Manager.

6.   As a "Manager" on the Performance Management team, Mr. Paige was supposed to assist the team by performing load testing incident to the performance management of a client's enterprise-wide computer servers.  Unlike some other roles within the group, Mr. Paige's duties as a "Manager" did not contemplate or require that he develop business, and his duties also did not require that he supervise other employees.

7.   Each project taken on by the Infrastructure Technologies practice group required a specific set of skills, and Mr. Wirth staffed associates on projects based upon their individual skillsets and the client's needs.  If a project did not fit the associate's skillset, Mr. Wirth would not staff the associate on that project.  Once staffed on a project, associates billed hours against an allotment agreed upon between THG and the client.

8.   Beginning in May 2011, Mr. Paige was staffed on an Oracle/Hyperion upgrade project for Office Depot, the only THG client for whom he performed any services during his employment.  As the "Manager" on the project, Mr. Paige's role was to assist with performance testing functions in conjunction with THG's internal client contacts.

9.   Mr. Paige's work on the Office Depot project was performed during two separate periods: (i) an approximately five (5) week period in May and June of 2011; and (ii) approximately nine (9) days between October and November of 2011.  These periods involved different phases of the project, both a global assessment for recommended changes and a subsequent implementation of

the recommended changes.  During each period, Mr. Paige worked onsite for a brief time at Office Depot's headquarters in Boca Raton, Florida, as well as remotely from his home in California.

10. As the Office Depot project progressed, THG was made aware of several complaints by Office Depot management regarding various deliverables (including both timeliness and quality) on the project, including deliverables that fell within Mr. Paige's scope of work.  To appease its client, THG agreed to a billing adjustment, which included a charge back of all of Mr. Paige's hours for May 2011, for a total of 31.5 hours.  Notwithstanding, Mr. Paige continued to be staffed on the Office Depot project through its conclusion in November 2011.

11. During his deposition, Mr. Paige claimed that while working onsite for Office Depot in Boca Raton, Florida, Mr. Wirth "discriminated against him."  As to the perceived acts of "discrimination," Mr. Paige testified that on one occasion in or around June 2011, he, Mr. Wirth, and Juha Kilpinen, an Infrastructure Technologies Director, were all leaving the Office Depot facility to go to lunch.  At that time, Mr. Wirth allegedly remarked that Mr. Paige should be placed on the facility's security list so that "the security people in the building would not allow [him] into Office Depot."  However, Mr. Paige admitted that Mr. Wirth made no mention of his race either on this occasion or at any other time during his employment.  Mr. Paige further admitted that he returned to work the same day that the comment allegedly was made, and he continued to work for Office Depot and THG thereafter.

12. As an additional perceived act of "discrimination," Mr. Paige testified that Mr. Wirth failed to respond to an email that he sent regarding hotel arrangements for the Office Depot project.  According to Mr. Paige, when Mr. Wirth did not respond, he was required to make his own hotel arrangements away from the other members of the Office Depot team.  Mr. Paige explained, however, that though he was at a different hotel than his colleagues, he was much closer to the Office Depot facility, and he still worked with the team as he normally did.

13. As the Office Depot project neared its end, John LoPresti, an in house "Solutions Engineer, Performance Management Lead" for Office Depot who had worked with THG on the Oracle/Hyperion upgrade project, was in the process of searching for a new role to build on the skills that he had acquired at Office Depot.  To this end, Mr. LoPresti approached Mr. Wirth in the summer of August 2011 to inquire about any openings at THG in a role that would provide him with a greater scope of responsibility.

14. In September 2011, Mr. Wirth hired Mr. LoPresti, not as a replacement for Mr. Paige – or even to serve in the same "Manager" role as Mr. Paige – but as a "Director" on the Performance Management team.  The Director role differed significantly from Mr. Paige's role as a "Manager."  As a "Director," Mr. LoPresti, like Mr. Paige, was responsible for certain technical aspects of a project, but Mr. LoPresti had the added responsibility of developing business for the team, and ultimately, the practice group as a whole.  He also was tasked with generating business development opportunities to market THG's services with respect to Oracle/Hyperion capacity planning and performance management services to build out another team in the Infrastructure Technologies group to provide a new set of services to THG clients.  Despite these duties, Mr. LoPresti was not tasked with supervising Mr. Paige or otherwise evaluating his performance while at THG.

15. When Mr. LoPresti transitioned to THG, he did not work with Mr. Paige directly on any project, including, but not limited to, the Office Depot project.  Mr. LoPresti worked on matters for other clients, such as planning a buildout of a software system for a client's enterprise. Moreover, Mr. LoPresti's work on the Performance Management team did not include the performance and load testing that was part of Mr. Paige's scope of work with THG.  Rather, Mr. LoPresti served as a performance systems architect.  As such, he worked on both building out enterprise software systems and identifying opportunities within a system's development lifecycle. On the other hand, Mr. Paige's role was not to design systems or identify opportunities, but rather, once those steps were complete, to write and run particular performance testing scripts.  Though he attempts to compare himself to Mr. LoPresti, Mr. Paige admitted during his deposition that he is unaware of the full scope of Mr. LoPresti's duties as a Director.

16. Despite their limited interaction after Mr. LoPresti's transition to THG, Mr. Paige has repeatedly claimed that he "trained" Mr. LoPresti.  However, the only "training" that Mr. Paige could recall at his deposition consisted of Mr. Paige's responding to Mr. LoPresti's questions about the location of certain documents in databases that Mr. Paige himself had created and maintained and for which he was the "single point of contact," as well as some limited discussions about the materials in those documents.

17. And, though Mr. Paige alleges that Mr. LoPresti behaved discriminatorily toward him, he is unable to connect the acts of which he complains to race, and, regardless, such acts allegedly took place while Mr. LoPresti was employed with Office Depot and not while Mr. LoPresti was employed with THG.  In the end, Mr. Paige can only speculate that, because he is Black and Mr. LoPresti is Caucasian, any purportedly negative interaction between them purportedly was based upon Mr. Paige's race.

18. In the fall of 2011, performance-testing work, specifically load testing, was becoming scarce for THG.  At or around this time, many clients began to bring such testing "in house," to be performed by their own technology professionals.

19. After completion of the Office Depot project, Mr. Wirth attempted for months to secure billable work for Mr. Paige.  However, Mr. Paige's narrow performance testing skillset proved difficult to sell to potential THG clients.  And, though in or around January 2012 Mr. Wirth had a lead for a project in Seattle, Washington, the potential client ultimately did not elect to have THG provide any performance or load testing services.

20. In March 2012, after approximately four (4) months without success in finding billable work for Mr. Paige, Mr. Wirth was faced with a difficult decision as to whether THG could continue to retain Mr. Paige.  Throughout his ten (10) months with THG, Mr. Paige had billed only a total of 178 hours, the equivalent of less than five (5) weeks of billable work.  Further, he had not performed any billable work since November 2011.

21. Despite his gross underutilization, Mr. Paige continued to collect his full salary throughout his employment.  This had a direct and tangible impact on the profitability of the Infrastructure Technologies group and could not continue.  As a result, and in light of significant pressure from

upper management about maintaining profitability, Mr. Wirth concluded that it was necessary to end Mr. Paige's employment. Mr. Paige acknowledged at his deposition that a decision to terminate an unprofitable THG associate rested with Mr. Wirth and his judgment as Principal for the Infrastructure Technologies group.

22. Mr. Wirth consulted with his supervisor, Scott McHale ("Mr. McHale"), a THG Practice Leader, regarding his conclusion. Mr. McHale concurred with and approved Mr. Wirth's decision to terminate Mr. Paige's employment.

23. After his discussion with Mr. McHale, Mr. Wirth also consulted with Michelle Ramirez, Senior Director, Human Resources, as part of his normal procedures when deciding to terminate an associate. While Ms. Ramirez inquired if it was possible to avoid termination by transferring Mr. Paige to another position within THG, at that time, the Performance Management team was the only team at THG that performed work matching Mr. Paige's narrow skillset and the team had no work for Mr. Paige to perform. Consequently, Ms. Ramirez concurred with Mr. Wirth's decision.

24. Mr. LoPresti was not consulted and did not otherwise participate in Mr. Wirth's decision to terminate Mr. Paige's employment. He also did not provide any recommendation for ending Mr. Paige's employment, and he was not solicited for any such recommendation.

25. Ms. Ramirez and Mr. Wirth together contacted Mr. Paige by telephone on March 23, 2012, to notify him of the decision to end his employment. After Mr. Wirth communicated the decision to terminate [him], and explained to Mr. Paige the unfortunate reality that THG simply did not have any work available for his skillset and, as a result, would need to terminate his employment. Ms. Ramirez then advised Mr. Paige that he would be offered severance in accordance with company policy if he signed a release agreement. While Mr. Paige asked questions about next steps concerning the end of his employment, Mr. Paige made no mention during that conversation that he felt that he was being treated disparately or that he was being discriminated against because of his race. And, indeed, at no time during his employment had Mr. Paige raised any such concerns.

26. While Mr. Paige initially accepted the severance offered to him and signed a release, he later rescinded his acceptance without explanation. Even then, in his revocation correspondence, Mr. Paige failed to mention anything about alleged discrimination or disparate treatment. It was not until sometime in June 2012, roughly three (3) months after his separation, that Mr. Paige, through counsel, raised any allegation of discrimination.

27. Approximately six (6) months later, Mr. Paige filed an intake questionnaire with the United States Equal Employment Opportunity Commission. However, Mr. Paige never considered his intake questionnaire to be a "charge of discrimination," and he did not file the Charge until August 2013, nearly eighteen (18) months after his employment with THG ended. Further, during his deposition, Mr. Paige was unable to identify any evidence to support the allegations made in his belated Charge, most notably, his unsupported allegation that Mr. LoPresti was "hired out of compliance" with some unknown – and nonexistent – policy.

28. Since filing the instant action, Mr. Paige has identified further actions that he deems discriminatory, but he admitted that he is unable to connect any of them to his race. Specifically, at his deposition, Mr. Paige testified to the following actions, none of which concern distinctions based on race:

(i)      Mr. Paige allegedly was asked to hide communications with Mr. LoPresti;

(ii)     Mr. Paige was not allowed to copy Mr. LoPresti on correspondence with Office Depot;

(iii)    Mr. Paige allegedly was told to stand in to present at Office Depot meetings in place of Mr. LoPresti; and

(iv)     Along with another Caucasian employee, Mr. Paige allegedly was told to hide his desktop from Office Depot associates to prevent them from seeing emails sent by Mr. LoPresti to the THG team.

29. The Infrastructure Technologies group continued to exist after Mr. Paige's departure, but Mr. Paige never was replaced and his duties never were absorbed by anyone else. And, in the years that followed, as companies continued to pull more and more aspects of performance management in house, the work available for the whole group (including all three (3) teams) dried up.

30. As a result, the Infrastructure Technologies group eventually was completely disbanded, with nine (9) of twelve (12) positions being eliminated (including that of Mr. LoPresti in April 2015) and Mr. Wirth, himself, eventually being let go in November 2017. To date, the group has not been reconstituted.

31. Notably, on two (2) occasions in 2015, before the group was dissolved, THG's recruiting department reached out to Mr. Paige to inquire about his interest in new opportunities with THG. Mr. Paige failed to respond to those inquiries.

**3.  <u>Discussion</u>**

Defendant seeks judgment as a matter of law as to Plaintiff's Title VII claim on the grounds that the undisputed material facts clearly establish that Plaintiff never fell victim to race discrimination. <u>See</u> Motion for Summary Judgment [D.E. 76 at 5-15]. Because there is no direct evidence of race discrimination against Plaintiff by Defendant, Plaintiff must establish either: (a) a *prima facie* case of race discrimination; or (b) "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." <u>Standard</u>, 161 F.3d at 1330; <u>Tomczyk</u>, 198 F. App'x at 809; <u>Lewis</u>, 934 F.3d at 1185.

a. *Prima facie case of race discrimination*

Defendant does not dispute that Plaintiff is a member of a protected class, that he was subjected to an adverse employment action, and that he was qualified to do his job.  See Motion for Summary Judgment [D.E. 76 at 7].  Defendant argues, however, that Plaintiff is unable to establish a *prima facie* case of race discrimination because he has failed to show that Defendant treated similarly situated employees outside of his protected class more favorably than he was treated.  Id. at 7-9.

Plaintiff claims that Mr. LoPresti, who is Caucasian, is a purportedly similarly situated employee that was treated more favorably.  See EEOC Charge [10-1]; Intake Questionnaire [D.E. 32 at 9-10].  Accordingly, Plaintiff must demonstrate that he and Mr. LoPresti "were 'similarly situated in all material respects.'"  Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1218 (11th Cir. 2019) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  To be similarly situated in all material respects, "a comparator should, generally, have (1) 'engaged in the same basic conduct (or misconduct);' (2) 'been subject to the same employment policy, guideline, or rule;' (3) 'been under the jurisdiction of the same supervisor;' and (4) shared a similar 'employment or disciplinary history' to the plaintiff."  Hester v. Univ. of Alabama Birmingham Hosp., 798 F. App'x 453, 457 (11th Cir. 2020) (quoting Lewis, 918 F.3d at 1227-28).

Plaintiff served as an Enterprise Performance Manager on the Performance Management team of Defendant's Infrastructure Technologies practice group.  Undisputed Facts ¶¶ 3, 5-6.  In that capacity, he was responsible for performing "load testing incident to the performance management of a client's enterprise-wide computer servers."  Id. ¶ 6.  He was not responsible for developing business or supervising other employees.  Id.  By contrast, Mr. LoPresti served as a Director on the Performance Management team of its Infrastructure Technologies practice group.  Id. ¶ 14.  His technical responsibilities included serving as a performance systems architect which

17

required "building out enterprise software systems and identifying opportunities within a system's development lifecycle." Id. ¶¶ 14-15. Once Mr. LoPresti's technical tasks were completed, Plaintiff was then responsible for writing and running particular performance testing scripts. Id. ¶ 15. In addition to his technical responsibilities, Mr. LoPresti was also responsible for: developing business for both the Performance Management team and the Infrastructure Technologies practice group; and "generating business development opportunities to market [Defendant]'s services with respect to Oracle/Hyperion capacity planning and performance management services to build out another team in the Infrastructure Technologies group to provide a new set of services to [its] clients." Id. ¶ 14.

Viewing all the evidence and drawing all reasonable inferences in Plaintiff's favor, the undersigned finds that Plaintiff and Mr. LoPresti were not similarly situated in all material respects because Plaintiff and Mr. LoPresti's respective positions required the performance of different responsibilities. See Hill v. Emory Univ., 346 F. App'x 390, 395 (11th Cir. 2009) (holding that plaintiff and his purported comparator were not similarly situated in all material respects because, inter alia, their respective jobs required the performance of different responsibilities). Therefore, Plaintiff cannot establish a *prima facie* case of race discrimination under Title VII. Tomczyk, 198 F. App'x at 809. Given Plaintiff's failure to establish a *prima facie* case of race discrimination, there is no rebuttable presumption of discrimination; hence, Plaintiff cannot succeed on his Title VII claims through circumstantial evidence. Adams, 242 F. App'x at 619.

   b. *Convincing mosaic of circumstantial evidence*

With regard to this alternative method for establishing an inference of intentional discrimination, Plaintiff cites the following purported instances of discrimination to support his claim that he was terminated because of his race:

➢ Mr. Wirth failed to respond to Plaintiff's email inquiry regarding lodging in Boca Raton for work on the Oracle/Hyperion project ("Oracle Project") contracted by Office Depot. As a result, Plaintiff made his own lodging arrangements and stayed at a different hotel from the rest of the project members.

➢ While Mr. Wirth, Plaintiff, and another of Defendant's employees were leaving Office Depot's headquarters in Boca Raton for a lunch break, Mr. Wirth remarked that Plaintiff should be placed on the facility's security list "so that 'security people in the building would not allow [him] into Office Depot.'" (alteration in original).

➢ While employed by Office Depot and working with Plaintiff on the Oracle Project, Mr. LoPresti behaved discriminatorily against Plaintiff.

➢ Defendant hired Mr. LoPresti outside of compliance with Defendant's company policy.

Undisputed Facts ¶¶ 11-14, 17, 27.

There is no evidence that Defendant systematically treated similarly situated employees outside of Plaintiff's protected class better than he was treated. Mr. Wirth, who was responsible for hiring and terminating Plaintiff, never made any mention of Plaintiff's race during Plaintiff's tenure. Undisputed Facts ¶¶ 4, 11, 21-23. There is no evidence to suggest that Mr. LoPresti's behavior toward Plaintiff during the Oracle Project was motivated by racial animus. Id. ¶¶ 17, 28. In the fall of 2011, performance-testing work, specifically load testing, became difficult for Defendant to obtain because many of its clients made the decision to stop outsourcing that work. Id. ¶ 18. As a result, Mr. Wirth was unable to find billable work consistent with Plaintiff's skillset—which ultimately led Plaintiff's termination. Id. ¶¶ 19-23, 25. However, prior to Plaintiff's termination: he continued to receive his full salary despite not performing any billable work since November 2011; and alternatives to his termination were contemplated, such as transferring him to another position within the company, but ultimately deemed non-viable because of his narrow skillset. Id. In 2015, following Plaintiff's termination, Defendant's recruiting department attempted to contact Plaintiff regarding new opportunities, but he failed to respond to their inquiries. Id. ¶ 31. Ultimately, due to the decreased demand for the Infrastructure

Technologies group's services: Plaintiff's position was never refilled; 9 out of 12 positions within the group were terminated—including Mr. LoPresti's in 2015; and Mr. Wirth was terminated in November 2017.  Id. ¶¶ 29-30.

Viewing all the evidence and drawing all reasonable inferences in Plaintiff's favor, the undersigned concludes that Plaintiff has failed to present a convincing mosaic of circumstantial evidence that would allow a jury to infer that his termination was the result of discriminatory animus.  See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.") (citing Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984), abrogated on other grounds by Lewis, 918 F.3d at 1213); see, e.g., Dorvil v. Advance Stores Co., No. 10-CV-60036, 2011 WL 6069362, at *14 (S.D. Fla. 2011) (finding that the relationship between a supervisor's racially and culturally insensitive comments toward an employee and that employee's subsequent termination was "simply too attenuated to establish an inference of discrimination.").

Having concluded that Plaintiff has failed to establish either a *prima facie* case of race discrimination or a convincing mosaic of circumstantial evidence that would allow a jury to infer that he was terminated because of his race, the undersigned recommends that Defendant's Motion for Summary Judgment be GRANTED on this basis and that final judgment be entered in Defendant's favor.  Tomczyk, 198 F. App'x at 809; Lewis, 934 F.3d at 1185.

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned **RESPECTFULLY RECOMMENDS** that Defendant's Motion for Summary Judgment [D.E. 76] be **GRANTED** and

that final judgment on non-liability be **ENTERED** in favor of Defendant as to Plaintiff's Title VII claim.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Jose E. Martinez, United States District Judge. Failure to file timely objections may bar the parties from attacking the factual findings contained herein on appeal. See Resolution Tr. Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993). Further, "failure to object in accordance with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." See 11th Cir. R. 3-1 (I.O.P. - 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida this 9th day of July, 2020.

_____
ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

Copies furnished via CM/ECF to:

United States District Judge Jose E. Martinez
Counsel of Record

Copies furnished by mail to:

Charles Paige
2450 East Del Mar Blvd., Unit 4
Pasadena, CA 91107